IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| INNOVATIVE GLOBAL SYSTEMS LLC., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CASE NO. 6:09-CV-157 |
| TURNPIKE GLOBAL TECHNOLOGIES LLC, CADEC GLOBAL, INC., XATA CORPORATION, GENERAL ELECTRIC COMPANY, TRIMBLE NAVIGATION, LTD. and NETWORKFLEET, INC., | § § § § § § § § § | |
| Defendants. | § | |

DEFENDANT CADEC GLOBAL, INC.'S
RESPONSIVE BRIEF REGARDING CLAIM CONSTRUCTION

# TABLE OF CONTENTS

I.   THE PATENTS-IN-SUIT IN CONTEXT……………………………………..……….2

II.  CONSTRUCTION OF DISPUTED TERMS IN PATENTS-IN-SUIT……………………3

    A)  "First data communcations protocol" and "vehicle data communications
        protocol converter" unambiguously recite converting protocols, not data……………3

    B)  The "second data communications protocol" limitation must be read in
        view of the applicants' statements that the communications occur within
        a close proximity of the vehicle………………………………………..……….……….9

    C)  The term "transceiver" is limited by the statements the patentee made to
        win allowance……………………………………………………………………14

    D)  The "remote data communications terminal" limitation should be construed
        consistently with the intrinsic record………………………………………………17

    E)  "Connected" and "operatively connected" must be different in scope………………19

    F)  The term "heavy duty vehicle" should be simplified for a jury………………………20

    G)  "Data" only appears in claim elements concerning the tractor/trailer side,
        not on the remote terminal side…………………………….………………………....22

    H)  The ordinary meaning of "connector" is to link two or more components…………..23

    I)  "Convert" and "converting" requires that the entire protocol be converted…..............24

    J)  The Court should adopt Cadec's constructions for the means-plus-function
        terms……………………………………………………………………………....25

        1)  "vehicle data communications protocol converting means"………………….…..25

        2)  "means connected to said vehicle data communications protocol
            converter for transmitting the second data communications protocol
            from said vehicle, and for receiving the second data communications
            protocol from a remote data communications terminal"…………………....…..28

        3)  "a vehicle data communications protocol converter connected to said
            plurality of electrical conductors"……………………………………………...…29

III. CONCLUSION……………………………………………………………..………29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*B. Braun Medical, Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997)......................................................................................26

*Biomedino, LLC v. Waters Techs. Corp.*,
   490 F.3d 946 (Fed. Cir. 2007)........................................................................................25

*Chef America, Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004)................................................................................4, 6, 7

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*,
   214 F.3d 1302 (Fed. Cir. 2000)........................................................................................7

*Elkay Mfg. Co. v. EBCO Mfg. Co.*,
   192 F.3d 973 980 (Fed. Cir. 1999)................................................................................14

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008)......................................................................................29

*Hakim v. Cannon Avent Group, PLC*,
   479 F.3d 1313 (Fed. Cir. 2007) at 6......................................................................11, 13, 15

*Hoganas v. Dresser Indus., Inc.*,
   9 F.3d 948 (Fed. Cir. 1993) ............................................................................................7

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)......................................................................................20

*Lucent Techs., Inc., v. Gateway, Inc.*,
   525 F.3d 1200 (Fed. Cir. 2008)....................................................................................6, 7

*Northrop Grumman Corp. v. Intel Corp.*,
   325 F.3d 1346 (Fed. Cir. 2003)......................................................................................27

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)......................................................................................25

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007)................................................................................10, 15

STATUTES

35 U.S.C. § 112..............................................................................................................26, 29

35 U.S.C. § 112(6) .........................................................................................................26, 28

Cadec Global, Inc. ("Cadec") has a history of innovation in the vehicle mobile technology services industry.  Cadec was the first, in 1976, to introduce automated Department of Transportation driver logs and automated collection of miles for state fuel tax reporting. Throughout the years, Cadec has remained at the forefront of the mobile vehicle tracking technology.  In 1995, Cadec introduced one of the first real-time data monitoring systems on the road, the RoadRelay and HighwayMaster data system.  This product marked the first time engine related data was transmitted directly to a dispatch office.  (Ex. A (Cummins Press Release dated Sept. 28, 1995) at Cadec_02055-02056.)[1]  Despite its small size, Cadec introduced several versions of its RoadRelay and HighwayMaster data systems in the 1994-2000 time period.  Some of these versions even predated the filings of the Patents-in-Suit.

The systems Plaintiff Innovative Global Systems, LLC ("IGS") accuses in this case are continuing product lines of those initial systems Cadec developed and released in 1994-1995. The early Cadec systems are at least functionally identical to the Cadec products that IGS identified in its infringement contentions, namely the Cadec PowerVue Management System and Associated TU-100 Telematics Unit.

IGS has apparently prepared its constructions with two goals in mind.  First, IGS seeks to redraft the claims to cure the patentee's drafting error in claiming the conversion and transmission of protocols rather than the conversion and transmission of data.  IGS drafted the claims to convert and transmit protocols, not data, and IGS's citations to specification and prosecution history cannot overcome the plain meaning of the claims.  Second, IGS seeks to recapture subject matter the patentee explicitly disavowed during prosecution of the parent patent to the Patents-in-Suit.  The Federal Circuit has rejected both approaches, as should this Court.

---

[1] A copy of the Press Release is attached as Exhibit A to the Declaration of Lisa Kelly filed with this Response Brief.  Unless otherwise noted, all exhibits referenced herein are exhibits to the Kelly Declaration.

Cadec has endeavored to fairly interpret the claims in view of the ordinary meaning and intrinsic evidence.  In support of Cadec's constructions, and in response to IGS's Brief, Cadec submits the following brief.

## I.   THE PATENTS-IN-SUIT IN CONTEXT

U.S. Patent Nos. 6,411,203 ("the '203 patent")[2], 6,608,554 ("the '554 patent")[3], 6,744,352 ("the '352 patent")[4], 7,015,800 ("the '800 patent")[5], and 7,449,993 ("the '993 patent")[6] (collectively, the "Patents-in-Suit") are directed generally to wireless communications between heavy duty vehicles and remote data communication terminals.  A data communications apparatus is connected to the tractor and the trailer for communicating data to and from the tractor and the trailer.  NetworkFleet, Inc., a codefendant in this action, has also counterclaimed U.S. Patent No. 6,064,299 ("the '299 patent")[7] in this suit.[8]

The '299 patent is the parent of the Patents-in-Suit.  Nearly all of the Patents-in-Suit have terminal disclaimers that render the prosecution statements made during the '299 prosecution applicable to the continuation Patents-in-Suit.  (*See* Ex. H, I, J, K (Terminal Disclaimers for the '203 patent, '554 patent, '352 patent, and '993 patent) at IGS000445-000449, IGS001942-001943, IGS003355-003356, IGS007262-007276.)   The '299 patent discussed a data communications apparatus for two-way communications between the heavy duty vehicle and a remote data communications terminal related to operating conditions of the vehicle.  (Ex. G

---

[2] A copy of the '203 patent is in Exhibit B.

[3] A copy of the '554 patent is in Exhibit C.

[4] A copy of the '352 patent is in Exhibit D.

[5] A copy of the '800 patent is in Exhibit E.

[6] A copy of the '993 patent is in Exhibit F.

[7] A copy of the '299 patent is in Exhibit G.

[8] Cadec has not asserted a counterclaim related to the '299 patent.

('299 patent) at 2:15-19.)   The apparatus included a vehicle data communications protocol converting means for converting a first local-area data communications protocol to a second local-area data communications protocol.  (*Id.* at 2:50-55.)  The '299 patent characterized the second data communications protocol as "preferably one of either an infrared data communications protocol or a radio frequency ('RF') data communications protocol."  (*Id.* at 7:26-28.)  The RF communications protocol could be long-range or short range.[9]  To overcome a rejection during prosecution, however, the patentee elected to limit his claims to cover only short-range infrared or RF communications.   As Cadec discusses in more detail below, the patentee specifically excluded satellite communications.  IGS now seeks to reclaim what the patentee disavowed.  This Court should hold IGS to the deal it made with the Patent Office to originally receive a patent on this type of communications apparatus.

## II.  CONSTRUCTION OF DISPUTED TERMS IN PATENTS-IN-SUIT

### A) "First data communications protocol" and "vehicle data communications protocol converter" unambiguously recite converting protocols, not data.

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "first data communications protocol"[10]<br><br>"first vehicle data communications protocol"[11] | a set of rules governing the treatment and format of communications to and from vehicle electronic subsystems | IGS, NetworkFleet and Cadec have agreed that these two phrases will have the same construction.<br><br>IGS proposes that these phrases be construed as "data in a communication protocol |

---

[9] *Id.* at 7:28-34 ("In other words, the second data communications protocol is preferably a through-the-air type of . . . protocol which does not require equipment to be coupled to the heavy duty vehicle 20 when obtaining data therefrom . . . .").

[10] Appears in '203 (Claims 1, 6, 11), '554 (Claims 1,6,11), '352 (Claim 11, 55), '800 (Claims 1, 10, 12), and '993 (1, 7, 8, 15, 20).

[11] Appears in '203 (Claim 24), '554 (Claim 24), '352 (Claim 55), '800 (Claim 25), and '993 (Claims 15, 20).

| | | associated with the vehicle, for example, J1708 or J1939." |
| --- | --- | --- |
| "vehicle data communications protocol converter"[12] | a device capable of converting one set of rules governing the treatment and format of vehicle data communications to another set of rules governing the treatment and format of vehicle data communications. | IGS believes that the term "vehicle" has its plain and ordinary meaning and that "data communications protocol converter" should be construed as "a device that converts data in one protocol into data of another protocol" |

The dispute concerning the constructions of "a first data communications protocol" and "a vehicle data communications protocol converter" centers on whether the Court should rewrite the claims to correct the drafting error made by the patentee that causes the claims to cover the conversion of *protocols* rather than the conversion of *data* formatted according to a protocol.[13] The answer is plainly no. The claim language is unambiguous, and thus cannot be restructured to fit IGS's infringement theories. The Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Only Cadec's proposed constructions provide guidance for the jury on the meaning of these terms without improperly redrafting the claims to alter that meaning.

The relevant portion of claim 1 of the '203 patent states "vehicle data communication protocol converting means . . . for converting a *first data communications protocol* associated with data communications along the plurality of electrical conductors *to a second RF data communications protocol*." (Ex. B ('203 patent) 11:38-42 (emphasis added).) The ordinary meaning of this claim language is that one protocol is converted to another protocol. Through its

---

[12] Appears in '554 (Claim 11), '352 (Claim 11), and '993 (Claims 1, 8).

[13] IGS in its claim construction brief assimilates the arguments for both of these terms into "first data communications protocol." For clarity, Cadec has grouped these claims together.

constructions, Cadec simply provides the jury with the commonly understood definition of what a "protocol" is in this context, namely a set of rules governing the treatment and format of vehicle data communications.  (*See* Ex. L (*Newton's Telecom Dictionary*, Feb. 1999, at 630) NF0000196-0000199 (defining "protocol" as a "set of rules governing the format of messages that are exchanged between computers and people").)  The meaning of the claim language—which requires conversion of one protocol to another protocol—remains unchanged.

The specification supports Cadec's construction.  The summary of the invention describes the vehicle data communications protocol converting means as "converting a first data communications protocol associated with data communications along the plurality of electrical conductors to a second data communications protocol."  (*See,* Ex. B ('203 patent) at 2:62-27.) Similarly, the specification explains that "the data communications apparatus 30 preferably also has a vehicle data communications protocol converting means . . . for converting a first data communications protocol associated with data communications . . . to a second data communications protocol."  (*See, e.g., id.* ('203 patent) at 6:22-32.)  The method of the present invention preferably includes "converting a first vehicle data communications protocol associated with data communications along the plurality of electrical conductors 38 to a second data communications protocol."  (*See, e.g., id.*, at 10:32-37.)  Thus, Cadec's construction accounts for how IGS described its converter.

In contrast with Cadec's construction, IGS's construction would insert the word "data" where it does not exist in the claim, thereby redrafting it to cure the apparent error made by the patentee.  For support, IGS cites language from the specification that appears *nowhere* in the claims.  (*See, e.g.*, Plaintiff IGS's Opening Brief Regarding Claim Construction Issues Pursuant to Patent Rule 4-5(a) ("IGS Opening Br.") at 13 (quoting Summary of the Invention).)  These

citations cannot overcome the fact that the language in the claims clearly requires conversion of protocols, not data. Moreover, IGS ignores the language in the specification quoted above, which supports Cadec's construction. Courts have routinely declined to alter claim language when its ordinary meaning is unambiguous, irrespective of the result. "[W]here we conclude that the claim language in unambiguous, we have construed the claims to exclude all disclosed embodiments." *Lucent Techs., Inc., v. Gateway, Inc.*, 525 F.3d 1200, 1215-16 (Fed. Cir. 2008); *Chef America, Inc.*, 358 F.3d at 1375 ("[W]e have repeatedly declined to rewrite unambiguous patent claim language."). IGS has pointed to no ambiguity that would open the door to correcting the clearly stated claim language.

The Federal Circuit has rejected arguments similar to IGS's position that the specification should override the ordinary meaning of an unambiguous claim term. In *Lucent Technologies*, the Federal Circuit reiterated the rule set forth in *Chef America* that courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity. *Lucent Techs.*, 525 F.3d at 1215-16 (listing cases). In *Lucent Technologies*, the parties disputed whether the construction of the phrase "each successive iteration including the steps of" required that "all of the steps following this clause [steps 1-5] must each be performed in forming each pulse," as found by the district court, or only that "step 5 needs to be performed in forming each pulse, whereas steps 1-4 may be performed only once per frame," as Plaintiff Lucent Technologies, LLC argued. *Lucent Techs.*, 525 F.3d at 1213-14. Lucent argued, and the Court agreed, that all of the figures described an embodiment that operated according to Lucent's proposed construction. *Id.* at 1214. The Court also noted that the district court's construction was "not supported by the sole embodiment described in the specification." *Id.* Nevertheless, the Court affirmed the district court's construction, finding that the unambiguous claim language

clearly supported it and that the patentee had never redefined the claim term to have an alternative meaning.  *Id.* at 1215-16.  Rewriting the claims "would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention."  *Id.* at 1215 (quoting *Hoganas v. Dresser Indus., Inc.*, 9 F.3d 948, 951 (Fed. Cir. 1993).[14]

Similarly, in *Chef America*, the Federal Circuit affirmed the district court's construction of the phrase "heating the resulting batter-coated dough to a temperature in the range of about 400° F to 850° F" as having its ordinary meaning, despite the nonsensical result.  *Chef Am.,* 358 F.3d at 1374-76.  The Court recognized that the plain and ordinary meaning would render the claims nonsensical and unable to perform the function the patentees intended.  *Id.*  However, the Court recognized that the claims unambiguously required that the dough be heated to a temperature range of 400° F to 850° F.  *Id.*  Rejecting the notion that claims should be construed as one of ordinary skill in the art would do, the Federal Circuit found that the words did not have a special meaning, and therefore declined to rewrite the claim.  *Id.*

As was the case in *Lucent Technologies* and *Chef America*, the language of the claims at issue in this case unambiguously claims "converting a first data communications protocol associated with data communications along the plurality of electrical conductors to a second data communications protocol."  (*See, e.g.,* Ex. C ('554 patent) at 11:31-36.)  The language of the claims is susceptible to only one reasonable construction, that the vehicle data communications protocol converter converts the first data communications protocol to a second data communications protocol.  As such, the claims should be construed as the patentee drafted them. *See Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1309 (Fed. Cir. 2000) ("[H]aving concluded that the amended claim is susceptible of only one reasonable construction,

---

[14] The *Lucent Technologies* court noted an "exception to this rule" exists "when there is an obvious administrative or typographical error not subject to reasonable debate."  *Lucent Techs.*, 525 F.3d at 1215 n.8.  This exception does not apply in this case, in which IGS used the same language in every claim of five related patents.

we cannot construe the claim differently from its plain meaning in order to preserve its validity . . . .").

In formulating the claims, the patentee had the option of claiming conversion and transmission of data, but apparently chose not to do so.  For example, claim 1 of the '203 patent recites "a data communications apparatus connected to said tractor and said trailer for *communicating data to and from said tractor and said trailer*."  (Ex. B ('203 patent) at 11:25-28 (emphasis added).)  The claim language thus unequivocally describes communicating *data* when discussing communications between the tractor and trailer.  However, in the converting element of that same claim (and every other asserted claim), the patentee recited "vehicle data communications protocol converting means . . . for converting a first data communications *protocol* . . . to a second RF data communications *protocol*."  (*Id.* at 11:38-43 (emphasis added).)  The patentee also recites transmitting *protocols*, not *data*: "a first RF transceiver . . . for transmitting and receiving the second RF data communications protocol."  (*Id.* at 11:37-40.)  Thus, the patentee distinguished between data and protocols within the very same claim.  In the instance of the converting and transmitting elements, the language unambiguously calls for the conversion and transmission of protocols.

Notably, IGS does not contest Cadec's definitions of these terms (and their incorporated definition of "protocol") as technically incorrect; it instead seeks to recast the word "protocol" to mean data in that protocol.  For support of its constructions, IGS states that the specification could not be clearer in its requirement that "data encoded in protocols is converted and transmitted."  (IGS Opening Br. at 13.)  Contrary to IGS's assertion, however, the phrase "data encoded in protocols is converted and transmitted" never appears in the specification of the

Patents-in-Suit.  The word "encoded" never appears in the specification for the Patents-in-Suit. The Court should reject IGS's attempt to rewrite the claims and specification.

Additionally, IGS's assumptions on how the Examiner of the '299 patent interpreted the prior art against similar claim language are insufficient to overcome the ordinary meaning of those phrases.  The examiner in one sentence suggests that the protocol is an instrumentality— "the status signals would be encoded onto the electrical system *by the claimed first protocol*"— and then in the next suggests that it is intangible—"[t]he received data would be transmitted . . . would be certainly *converted to another protocol*."  (*See* Ex. K to IGS Opening Br. at 5 (emphasis added).)  This language is simply not clear enough to override the straightforward language of the claims.

In light of the unambiguous claim language and the principles of claim construction, the Court should construe these phrases based on the unambiguous ordinary meaning of these terms. The plain meaning dictates that "first data communications protocol" means "a set of rules governing the treatment and format of communications to and from vehicle electronic subsystems" and "vehicle data communications protocol converter" means "a device capable of converting one set of rules governing the treatment and format of vehicle data communications to another set of rules governing the treatment and format of vehicle data communications."

**B) The "second data communications protocol" limitation must be read in view of the applicants' statements that the communications occur within a close proximity of the vehicle.**

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "second data communications protocol"[15] | a set of rules governing the treatment and format of wireless communications | IGS, NetworkFleet and Cadec have agreed that these three phrases will have the same |

---

[15] Appears in '554 (Claims 1,11,12,24,25), '352 (Claims 11,55,56), and '993 (Claims 1,5,8,12,15,19)

| "second RF communication protocol"[16] "wireless data communications protocol"[17] | limited to close proximity of a vehicle | construction. IGS proposes that these phrases be construed as "data encoded in a [RF] communication protocol suitable for transmission between the vehicle and a remote location whether or not the vehicle is in operation." |
|---|---|---|

Cadec asks the Court to construe the "second data/RF communication protocol" to take into account the issues associated with the previous protocol terms and specific prosecution history related to this claim language.  The prosecution history mandates that communication between the heavy duty vehicle and the remote location be in a close proximity.  This point—that the claims of the parent patent are limited to communications in a close proximity—is one upon which everyone agrees.  (*See* IGS Opening Br. at 17 ("[T]he parent of the '203 Patent (the '299 Patent), . . . specifically claims data transmission from the vehicle to a remote location that is in close proximity to the vehicle.").)  As discussed in more detail below, the patentee inserted the term "local-area" into the phrase "second data communications protocol" to overcome a rejection in the parent patent.  After the Examiner approved the amendments and expressly limited "local-area" to "close proximity," IGS now attempts to disavow this limitation in construing this term.  In contrast, Cadec's construction places this term in context, without asking the jury to review the prosecution history, and holds IGS to its disclaimer in the parent patent.  *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007) ("[W]hen the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being

---

[16] Appears in '203 (Claims 1,11,12,24,25), '554 (Claim 29), and '800 (Claims 1,12,13,25,26).

[17] Appears in '993 (Claims 5,12, 19).

construed, those statements in the familial application are relevant in construing the claims at issue."), *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1317 (Fed. Cir. 2007) at 6 (noting that an applicant cannot recapture claim scope that was surrendered or disclaimed for a parent application).

Prior to the filing of the '203 patent application, IGS tried to obtain allowance of claims that recited only a generic "second data communications protocol." In particular, original claim 11 of the '299 patent recited

> 11. An apparatus for data communications associated with a heavy duty vehicle, the apparatus comprising:
>
> . . .
>
> a transceiver connected to vehicle data communications protocol converting means for transmitting the second data communications protocol from the heavy duty vehicle and receiving the *second data communications protocol* from a remote data communications terminal.

(Ex. M (Prosecution History for the '299 Patent, Original Patent Application, at 25-26) NF0000051-0000101, at NF0000082-0000083 (emphasis added).) The Examiner rejected these original claims of the '299 patent over combinations of three U.S. Patents, 5,025,253 (DiLullo), 5,442,810 (Jenquin), and 5,285,476 (Jasper). DiLullo, in particular, described a remote monitoring system for a tractor trailer communicating information via a satellite. (Ex. N (Office Action for the '299 Patent Application, Oct. 4, 1999) at NF0000117-0000122.) In response to this rejection, the patentee amended "second data communications protocol" to "second local-area data communications protocol." (Ex. O (Response to the Office Action for the '299 Patent Application, Nov. 15, 1999) at NF0000125-0000144.) In that response, the patentee characterized DiLullo as "a system for remotely monitoring a connect/disconnect status of a

tractor/trailer vehicle through use of a space-based satellite," not local-area communication.  The

patentee argued that if DiLullo and Jenquin were:

> somehow strangely combined[,] the result is a long-distance
> satellite communication tracking system for a tractor and a trailer
> with communications along the air brake hose of the tractor and
> trailer for trailer status.  [The addition of the third patent] results in
> a communication between the tractor and trailer through a
> magnetic circuit therebetween for trailer status. . . . Because none
> of the cited patents, alone or in combination, teach or suggest a
> plurality of electrical conductors or vehicle data communications
> converting means for local area two-way communications, [the
> amended claims should issue].

(*Id*. at 15-16, NF0000139-0000140.)   After receiving this limitation, the Examiner allowed the

claims to issue and expressly recognized IGS's disavowal in its reasons for allowance:

> The amendment specifically recited the "local-area" data
> communication protocol vs. the satellite long distance
> communication in the prior art.   The specification does not
> specifically use the term "local-area", however, *in view of the
> whole specification including the drawings, the data
> communication protocols are occurred within the closed
> proximity of the truck, trailer and hand held portable device.*
> Thus, the claimed "local-area" data communication has been
> interpreted as the communication *within a close proximity around
> the vehicle rather than the communication occurred in a
> substantial distance such as long distance RF communication
> and satellite communication*.

(Ex. P (Notice of Allowability for the '299 Patent Application, Jan. 31, 2000, at 1-2) at

NF0000145 (emphasis added).

    IGS now seeks constructions that would cover long-distance RF communications and

satellite communications, despite this disclaimer.  In support of its constructions, IGS relies on

additional disclosure submitted with continuation-in-part Patents-in-Suit.  (*See* IGS Opening Br.

at 17 (citing to figures in '352 patent).)  As quoted above, the Examiner cited the limitation to

local-area communications as the very reason the claims overcame the "satellite long distance

communication in the prior art."  (Ex. P (Notice of Allowability for the '299 Patent Application,

at 2) at NF0000145-0000150.)  For each of the '203, '993, '554 and '352 patents, the Examiner required the patentee to sign terminal disclaimers over either the '299 patent or the '203 patent because the subject matter claimed in these continuation patents was common and fully disclosed in the parent patents.  (*See* Ex. H, I, J, K (Double Patenting Rejections for the '203, '554, '352, and '993 patents) at IGS000435-000441, IGS001933-001937, IGS003333-003336, and IGS007256-7260.) Thus, the "second data communications protocol" limitation must be read as requiring local-area communications (within a close proximity of the vehicle).

IGS has made no showing in the prosecution history of the continuation patents that would permit IGS to rescind its disclaimed scope.  *See Hakim*, 479 F.3d at 1318 ("Although a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited.").  Absent proof that shows that IGS rescinded its disclaimer in the prosecution history, the "second data communications protocol" should be construed as "a set of rules governing the treatment and format of wireless communications limited to close proximity of the vehicle."

IGS incorrectly argues that the patentee only intended to claim the "local-area" embodiment in the parent '299 patent.  (IGS Opening Br. at 17-18.)  The patentee originally tried to claim the "second data communications protocol" without using "local-area," but the claims were rejected based on satellite based communications prior art as discussed above.  (Ex. N, (Office Action for the '299 Patent Application) at NF0000120-0000121.)   In response, the patentee limited the claims to "second *local-area* data communications protocol" to overcome the prior art.  (Ex. O (Response to the Office Action for the '299 Patent Application) at NF0000125-0000140.)   Recognizing that the patentee has limited the second data

13

communications protocol to a local-area communications protocol, *i.e.* a short-range protocol, the Examiner allowed the claims of the '299 patent. (Ex. P (Notice of Allowability for the '299 Patent Application) at NF0000146.) The Patents-in-Suit are continuations that present the same subject matter claimed in the parent '299 patent. (*See* Ex. H, I, J, K (Double Patenting Rejections for the '203, '554, '352, and '993 patents) at IGS000435-000441, IGS001933-001937, IGS003333-003336, and IGS007256-7260.) This limitation in the parent application should apply to the Patents-in-Suit. *See, e.g., Elkay Mfg. Co. v. EBCO Mfg*. Co., 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."). The applicant may have originally contemplated claiming close and long distance communications, but, when push came to shove, he amended his claims to distinguish them from prior art on the basis of local-area communications that are in a close proximity to the vehicle. Only Cadec's construction will properly account for the disavowal of scope made during prosecution, without requiring a jury to review the prosecution history behind those claims.

**C) The term "transceiver" is limited by the statements the patentee made to win allowance.**

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "transceiver"[18] | a device that transmits and receives wireless communications limited to a close proximity of a vehicle | IGS believes that construing this term would not be helpful to a jury. However, if this claim is to be construed, IGS believes that the plain and ordinary meaning of "transceiver" is "a device that transmits and receives." |

---

[18] Appears in '203 (Claims 1,11), '554 (Claims 1,11, 12), '800 (Claim 1,12), and '352 (Claim 11).

The parties' dispute regarding "transceiver" also centers on whether the patentee limited his invention in exchange for patent protection.  On this point, the patentee was clear:  the prior art covered satellite-based communications, whereas the patentee's claims recited local-area communications.  As such, the transceiver must be a device that transmits and receives wireless communications limited to close proximity of a vehicle.  As with the "second data communications protocol," the debate over "transceiver" is an instance in which IGS ignores statements by the patentee during the prosecution of the parent '299 patent that are applicable to the continuation Patents-in-Suit.  *See Ormco*, 498 F.3d at 1317.

As discussed above, the patentee specifically distinguished satellite communications in prior art systems from the local-area communications of the '299 patent.  After amending his claims to reflect this distinction, the patentee tried to recapture the subject matter he ceded in the prosecution of the '299 patent by introducing a claim in the continuation Patents-in-Suit that was nearly identical to the original claim in the parent '299 patent.  *See, Hakim*, 479 F.3d at 1318.  The table below compares the language of the two claims, revealing how the applicants attempted to recreate his original claim from the '299 patent:

| Amended Claim 11 of the '299 patent[19] | Claim 11 of the '203 patent[20] |
| --- | --- |
| 11.   (Amended)  An  apparatus  for  data communications associated with a [heavy duty] vehicle, the apparatus comprising: | 11.    An apparatus for data communications associated  with  a  vehicle,  the  apparatus comprising: |
| a  plurality  of  electrical  conductors associated with the [heavy duty] vehicle; | a  plurality  of  electrical  conductors associated with the vehicle; |

---

[19]  In  the  below  claim,  [brackets]  indicate  deletions  to  the  original  claim  and  underlined  portions  indicate amendments to the claims to overcome the prior art.

[20] Claim 11 of the '352 patent is nearly the same except it even removes the "RF" and reverts back to "second data communications protocol," the same language initially rejected by the Examiner in the '299 patent.  (Ex. D ('352 patent) claim 11, 17:55 - 18:2.)

| | |
|---|---|
| vehicle data communications protocol converting means connected to said plurality of electrical conductors for converting a first data communications protocol associated with data communications along the plurality of electrical conductors to a second <u>local-area</u> data communications protocol; | vehicle data communications protocol converting means connected to said plurality of electrical conductors for converting a first data communications protocol associated with data communications along the plurality of electrical conductors to a second RF data communications protocol; |
| a transceiver connected to said vehicle data communications protocol converting means for transmitting the second <u>local-area</u> data communications protocol from the heavy duty vehicle and receiving the second <u>local-area</u> data communications protocol from a remote data communications terminal <u>not connected to the vehicle</u>. | an RF transceiver connected to said vehicle data communications protocol converting means for transmitting the second RF data communications protocol from the heavy duty vehicle and receiving the second RF data communications protocol from a remote data communications terminal not connected to the vehicle |

Unless the claim at right is limited to the scope of the claims of the '299 patent, that claim will cover the subject matter the patentee ceded to obtain allowance over the prior art. For example, during prosecution of the '299 patent, the patentee explicitly distinguished his claims from the cited art because his claims were limited to local-area communications:

> Applicants respectfully submit that this combination [DiLullo, Jenquin, and Jasper] clearly fails to produce either local-area two-way communication between a vehicle and a remote data communications terminal for vehicle operational conditions, vehicle protocol converting means for converting a first local-area data communications protocol to a second local area data communications protocol, or a plurality of electrical conductors to which a ***transceiver and the vehicle data communications converting means are connected for local-area two-way data communications***.

(Ex. O (Response to the Office Action for the '299 Patent Application) at NF0000139-0000140 (emphasis added).)   The Examiner allowed the claims on this basis.   (Ex. P (Notice of Allowability for the '299 Patent Application) at NF0000146) (noting that "in view of the whole specification . . . the data communication protocols are occurred within the closed proximity of

the truck, trailer, and hand held portable device . . . .").)   The Examiner did not limit his statements regarding the notice of allowance to any particular embodiment.   Rather, he characterized the term "local-area" as evidenced by the <u>whole specification</u>. (*See id.*)   The Court should not allow IGS to recapture through claim construction the claim scope the applicant gave up to obtain patent protection.   Accordingly, in view of the prosecution history and the specification as a whole, the proper construction for "transceiver" is "a device that transmits and receives wireless communications limited to a close proximity of a vehicle."

**D) The "remote data communications terminal" limitation should be construed consistently with the intrinsic record.**

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "remote data communications terminal"[21] | a data collection station for receiving and transmitting wireless communications limited to close proximity of a vehicle | data communications terminal that is remote from vehicle whether or not the vehicle is in operation |

As discussed with respect to the above claim terms, the parties' dispute regarding "remote data communications terminal" is whether the term should be held to communications in a close proximity of a vehicle based on the intrinsic record.   Cadec's construction comports with the specification and appropriately accounts for IGS's disclaimers in the prosecution history.   As discussed above, the patentee limited the whole invention, not just an embodiment, in amending the claims to overcome prior art concerning vehicle monitoring references using satellite communications.

Cadec's construction comports with the specification in defining "remote data communications terminal" as a data collection station.   In the specification, the "remote data

---

[21] Appears in '203 (Claims 1,11,12,24,25), '554 (Claims 1,11,12,24,25), and '352 (Claims 11,55,56).

communications terminal 60 is preferably a computer, e.g., provided by a portable laptop or handheld computer, or other portable or substantially stationary remote data collection stations as understood by those skilled in the art." (Ex. B ('203 patent) at 9:36-40.) The examples provided in the specification for "remote data communications terminal," namely a portable laptop or handheld computer, further illustrates that the invention is meant to operate in close proximity to a vehicle. (*Id*. at 9:36-40.)

In contrast, IGS inserts superfluous words into its proposed construction that are unsupported by the specification and would further complicate the issue, rather than assist the jury. IGS rearranges the words in "remote data communications terminal" to create its definition, "data communications terminal that is remote from vehicle," then adds the additional limitation "whether or not the vehicle is in operation." The '203 patent specification never discusses the invention in terms of whether or not the vehicle is in operation. In particular, IGS's citation to column 7, lines 15-20 of the '203 patent is inapposite. (IGS Opening Br. at 27.) That portion discusses the "second data communications protocol," not the "remote data communications terminal." (Ex. B ('203 patent) at 7:15-20 ("In other words, the second data communications protocol is preferably a through-the-air type of data communications protocol which does not require equipment to be coupled to the heavy data vehicle . . . .").)

IGS also incorrectly asserts that a signal booster somehow implies that the vehicle must be moving. (IGS Opening Br. at 27.) As noted in the prosecution history of the parent '299 patent, the patentee tried to claim local-area and long-distance communications but ran into prior art for the long-distance communications. A signal booster to show long-range communication is simply a portion of the disclosure that the patentee could not claim because of the prior art cited by the Examiner.

18

The "remote data communications terminal" is described in the specification and is limited by the prosecution history.  IGS fails to capture this in its construction.  As such, the Court should adopt Cadec's construction.

### E)  "Connected" and "operatively connected" must be different in scope.

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "connected to"[22] | directly, physically linked to | "linked together physically, communicatively electrically, or logically" |
| "operatively connect[ed][ing]"[23] | electronically linked to, directly or indirectly | IGS believes that construing this term would not be helpful to a jury.  However, if this claim is to be construed, IGS believes that "operatively connected" should be construed as "linked together in such a way that operation of one can affect the other." |

The parties' dispute centers on the difference in claiming "connected" versus "operatively connected."  "Operatively connected" appears in the '993 patent in the dependent claim limitations for the three independent claims.  (*See* Ex. F ('993 patent) claims 2, 9, and 16, 16:38-40, 17:6-8, 18:9-11.)  The ordinary meaning of "operatively" implies an electronic and indirect connection.  Thus, the patentee knew how to draft an electronic, indirect connection, and did so in the case of connecting the electrical conductors to the electronic subsystems.  However, for converter, the patentee elected to use "connected to" to show that the "vehicle data communications protocol converter [is] connected to said plurality of electrical conductors."

Cadec's construction also aligns with the specification whereas IGS references irrelevant portions of the specification for this construction.  The specification provides that the electrical

---

[22] Appears in '203 (1,8,11,12,14,24), '554 (1,7,8,11,12,14), '352 (11,12,17), '800 (1,11,12,13 15), and '993 (1,8).

[23] Appears in '993 (Claims 2,9,16).

conductors connected to, for example, the electronic subsystem, are preferably a twisted pair wiring as understood by those skilled in the art.  (Ex. B ('203 patent) at 6:12-17.)  One of skilled in the art would understand that a twisted-pair wiring is a physical connection, not an electronic or logical connection.  IGS's citation to column 7, lines 54-56 supports Cadec's construction: "The connector 50 can also be connected to one or more of the electronic subsystems 40, e.g., an ABS system, preferably through the electrical conductors [twisted pair wiring]."  (IGS Opening Br. at 28.)  In this case, the connector is connected to the electronic subsystem via a direct, physical connection of the twisted pair wiring.  Moreover, in figure 7, the transceiver is directly and physically linked to the vehicle data communication protocol converter via the associated connector (*i.e.*, a transceiver may not have connections to hook into a converter).

The principles of claim scope require that "connected to" and "operatively connected" have different meaning.  As a general rule, "all claim terms are presumed to have meaning in a claim."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1119 (Fed. Cir. 2004) (observing that one of the constructions reads the term "operatively" out of the phrase "operatively connected").  "Operatively connected" implies a broader type of connection than "connected to," namely direct versus electronic and indirect.  Given that the ordinary meaning of "connected to" versus "operatively connected" describes direct versus electronic and indirect connection, this Court should adopt Cadec's construction for these terms.

### F)  The term "heavy duty vehicle" should be simplified for a jury.

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "heavy duty vehicle"[24] | a tractor and a connected trailer | IGS believes that construing this term would not be helpful to a jury.  However, if this |

---

[24] Appears in '203 (Claim 1,24) , '352 (Claim 17), and '800 (Claim 1).

|  |  | claim is to be construed, IGS proposes the construction "a vehicle having a gross vehicle weight rating of greater than 8500 pounds, or curb weight of more than 6000 pounds." |
| --- | --- | --- |

Cadec only seeks to simplify the term "heavy duty vehicle" based on all of the descriptions of this type of vehicle in the specification.  IGS's construction would further confuse a jury by introducing arbitrary weight limits and failing to exclude embodiments that are clearly not a heavy duty vehicle.

At present, IGS's construction appears to include many more things than just tractors and trailers, including boats, airplanes, tanks, and even more.  When the patentee wanted to speak of something broader than the tractor and a connected trailer example discussed throughout the specification, the patentee used the broader term "vehicle."  (*See, e.g.,* Ex. F ('993 patent) claim 1.)  The construction does not prevent IGS from expanding the scope of its claims to other types of vehicles by using "vehicle" in the claim, but introducing a weight limitation without specifying the type of vehicle creates unnecessary confusion for the jury.

Cadec's construction is reflected throughout the intrinsic record.  The background of the invention describes "the heavy duty vehicle industry" as using "tractor and trailer combinations." (Ex. B ('203 patent) at 1:19-26.)   In particular, the summary of the invention describes the "heavy duty vehicle" as "preferably a tractor and a trailer connected to the tractor."  (Ex. B ('203 patent) at 2:32-42.)  Though the "tractor/trailer combination" is listed as an embodiment, when the patentee wanted to claim other embodiments, the patentee used "vehicle" rather than heavy duty vehicle.  (Ex. B ('203 patent) at 4:64-67.)

IGS's selective citation to column 5, lines 8-13 of the '203 patent is misleading because it ignores the changes made to that exact portion of the specification in the continuation Patents-in-Suit.  In the '800 patent, for example, the same sentence reads:

> Although the present invention is particularly advantageous to heavy duty vehicles, it will be understood by those skilled in the art that other types of vehicles, such as a recreational vehicle, agricultural tractors or other heavy duty vehicles used in association with agricultural uses, automobiles, e.g., sedans, sports cars, luxury cars, race cars, train cars, pick-up trucks, sports recreations vehicles, and boats can also be used according to the present invention.

(Ex. E ('800 patent) at 8:4-12.)  In the above sentence, the patentee lists several types of vehicles in general, and in particular lists "heavy duty vehicles" and "other heavy duty vehicles used in association with agricultural uses."   The remaining items identified in this list fall under the general "other types of vehicles" category:   recreational vehicle, agricultural tractors, various types of automobiles, and boats.  These vehicles are not included in "other heavy duty vehicles."  Cadec's construction eliminates all of these ambiguities by construing "heavy duty vehicle" as "a tractor and a connected trailer" and preserves the remaining scope of vehicles under the "vehicle" claims.

### G)  "Data" only appears in claim elements concerning the tractor/trailer side, not on the remote terminal side.

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "data"[25] | "information collected from one or more vehicle electronic subsystems" | "information originating from or directed to a system of a vehicle and relating to operation, monitoring, or control of the system." |

---

[25] Cadec has properly identified where the term "data" should be construed in the claims: '203 patent, claim 1; '800, claim 1; and '993 patent, claim 1.

The difference between the two sides' constructions boils down to one issue: whether the claim term "data" includes information collected on the tractor/trailer or also the information at the remote terminal. Neither of the parties dispute that the "data" includes information collected on the tractor/trailer. Further, Cadec does not dispute that the specification does discuss data at the remote terminal. IGS's argument, however, fails to address the crux of the argument: whether the claimed "data" for which the parties seek construction appears anywhere but the portion related to information collected on the truck.

The claimed "data" for which Cadec seeks construction does not include the remote terminal end. For example, in claim 1 of the '203 patent, the claim recites: "a data communications apparatus connected to said tractor and said trailer for communicating **data** to and from said tractor and said trailer." (Ex. B. ('203 patent) at 11:25-28) (emphasis added). Every other instance of "data" occurs within a portion of another claim term that has already been construed elsewhere, *i.e.*, data communications protocol or remote data communications terminal. Because the term "data" has not been used in the claims on the side of the remote data communications terminal, the proper construction of data cannot include "control" information to the vehicle. Only Cadec's construction properly defines the scope of this term in the context of the claims.

**H) The ordinary meaning of "connector" is to link two or more components.**

| Term | Cadec's proposed construction | IGS's proposed construction |
|------|------|------|
| "connector"[26] | an instrumentality for electronically linking two or more components | IGS believes that construing this term would not be helpful to a jury. However, if this claim is to be construed, IGS believes that the |

---

[26] Appears in '203 (Claim 1 and throughout), '554 (Claim 1 and throughout), '352 (Claim 12), and '800 (Claim 1 and throughout)

|  |  | plain and ordinary meaning of "connector" is "device through which devices are connected." |
| --- | --- | --- |

Cadec asks this Court to construe connector to reflect how "connector" is used in the context of the invention. The dispute over this term is whether a physical device is required for a connector. Cadec does believe such a device is required, and otherwise does not dispute that this term may not require construction.

The ordinary meaning of "connector" is to bring two or more components together. Likewise, in the context of this patent, the connector is used to connect to a plurality of electronic conductors or connect the transceiver to the protocol converter means. The "connector" is used broadly in the context of the specification. In the Joint Claim Construction and Prehearing Statement, IGS cited to Figures 4-11 of the '203 patent as support for the "connector." (Ex. A to IGS Opening Br. at 6.) Cadec also has multiple citations to the specification in support of its definition of "connector." (*See id.*) The only requirement for the "connector" in the specification is that it be any "well known connector associated with trucks or other heavy duty vehicles." (Ex. B ('203 patent) at 7:54-56.) In view of the broad nature of connector, Cadec asks this Court to construe "connector" as "an instrumentality for electronically linking two or more components."

**I) "Convert" and "converting" requires that the entire protocol be converted.**

| Term | Cadec's proposed construction | IGS's proposed construction |
| --- | --- | --- |
| "convert" <br><br> "converting" | Cadec agrees that no construction is necessary for this term. | IGS believes that construing this term would not be helpful to a jury. However, if this claim is to be construed, IGS believes that one of skill in the art would understand this term to mean "re-encoding data" |

At this time, Cadec is no longer contesting the construction of "convert" and agrees with IGS that no construction is necessary for this term.  IGS's alternate construction suffers from the same deficiencies as other constructions because it rewrites the claim term to re-encoding "data" even though other portions of the claim better suited for this dispute have already been discussed above.  (*See* Section II.A)  As no dispute currently exists for the construction of this term, the Court should decline to construe this term.  *See  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("We, however, recognize that district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

**J)  The Court should adopt Cadec's constructions for the means-plus-function terms**

The parties have requested construction of three means-plus-function terms.  IGS and Cadec agree that two of those terms should be construed as means-plus-function limitations. Construction of a means-plus-function limitation involves two steps:  first, identify the function of the limitation, and, second, identify the corresponding structure for that function as described in the specification and equivalents thereof.  *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).  IGS disputes that the third term, "a vehicle data communications protocol converter connected to said plurality of electrical conductors," should be construed as a means-plus-function limitation.  Cadec agrees that this term should be construed either in accordance with "vehicle data communications protocol converter" or "vehicle data communications protocol converting means."

**1.  "vehicle data communications protocol converting means"**

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "vehicle data | CADEC:  This term is | "a circuit or microprocessor |

| communications protocol converting means"[27] | governed by 35 U.S.C. § 112(6).<br><br>Function: Converting a first data communications protocol associated with data communications along the plurality of electrical conductors to a second data communications protocol.<br><br>Structure: An RS-485 transceiver; '203, 6:39- 41;<br><br>a signal booster; '203, 7:8-12; preferably provided by amplification circuitry and/or power boosting circuitry '203, 7:31-38;<br><br>and any one or more of: J1708 to RS-485 converter, RS-485 to J1708 converter, RS-485 to IrDA converter, IrDA to RS-485 converter, RS-485 to RF converter, RF to RS-485 converter;<br><br>and structural equivalents. | that converts data encoded in one protocol into data encoded in another protocol and structural equivalents thereof." |

IGS agrees that the scope of this means limitation is governed by the sixth paragraph of 35 U.S.C. § 112, which provides that such terms "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."   "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."   *B. Braun Medical, Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

(a)  The function of "vehicle data communications protocol converting means."

---

[27] Appears in '203 (Claims 1, 11), '554 (Claim 1), and '800 (Claims 1,12).

Cadec's proposed function for the above limitation does not improperly limit this claim, as IGS suggests,[28] but instead incorporates the proper construction of the phrase "vehicle data communications protocol converter"–specifically, that it is converting protocols, not data encoded in a protocol. The construction of the function of this means-plus-function claim simply clarifies its meaning and ensures consistency among and between all of the claim terms at issue.

(b) The structure for "vehicle data communications protocol converting means."

As best as Cadec can tell, IGS has combined its structure and function into the construction "a circuit or microprocessor that converts data encoded in one protocol into data encoded in another protocol and structural equivalents thereof." (IGS Opening Br. at 20.) Thus, IGS's proposed structure is "a circuit or microprocessor." This is wholly insufficient as the structure must encompass all of the disclosure in the specification necessary to carry out the recited function. *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003) (defining structure requires identifying the structure necessary to carry out the function). The specification recites that the protocol converter includes an RS-485 transceiver (Ex. B ('203 patent) at 6:40), a signal booster (*id.* at 7:8-12), preferably provided by amplification circuitry and/or power boosting circuitry (*id.* at 7:31-38); and includes the protocol converters on Figures 5 and 11 of the '203 patent (J1708 to RS-485 converter, RS-485 to J1708 converter, RS-485 to IrDA converter, and IrDA to RS-485 converter, RS-485 to RF converter, RF to RS-485 converter). (*See* Ex. B ('203 patent) Figs. 5 and 11; Ex. E ('800 patent) Figs. 5, 11, 9:30-40.) IGS's construction, in contrast, only recites "a circuit of microprocessor" and provides no guidance as to the necessary structure. Because IGS's construction fails to account for all of the

---

[28] IGS appears to have incorrectly listed Cadec's function with respect to this claim phrase.

structure necessary to perform the function in the claims, this Court should reject that construction and adopt Cadec's construction.

2. **"means connected to said vehicle data communications protocol converter for transmitting the second data communications protocol from said vehicle, and for receiving the second data communications protocol from a remote data communications terminal"**

| Term | Cadec's proposed construction | IGS's proposed construction |
|---|---|---|
| "means connected to said vehicle data communications protocol converter for transmitting the second data communications protocol from said vehicle, and for receiving the second data communications protocol from a remote data communications terminal"[29] | CADEC:  This term is governed by 35 U.S.C. § 112(6).<br><br>Function: Transmitting the second data communications protocol from said vehicle and receiving the second data communications protocol from a remote data communications terminal.<br><br>Structure: IrDA compliant integrated circuit; '993, 10:6-11;<br><br>built-in infrared transceiver 35, such as an infrared light emitting diode and an infrared photodetector or photodiode, an infrared transceiver or emitter/detector pair; '993, 10:6-25;<br><br>a transceiver, which preferably includes a plurality of infrared light emitter or light emitting diodes, a plurality of infrared photodiodes, and associated drive and amplification circuitry; '993, 12:35-45;<br><br>a physical layer signal | The function recited for this term is "transmitting the second data communications protocol from the vehicle and receiving the second data communications protocol from a remote data communications terminal."<br><br>Structure relating to this claim element is found at least at:<br><br>Fig. 8, element 35"<br>Fig. 11, elements 35'<br>Fig. 15-19, 28, 31, 35, 36<br>Col. 7, lines 8-30<br>Col. 12, line 35-col. 13, line 8 |

---

[29] Appears in '993 (Claims 1, 8).  Cadec has revised the structure for this claim term.

| | processing transceiver, infrared or radio frequency, including a combination transmitter and receiver; '993, 12:46-52;<br><br>and structural equivalents. | |
|---|---|---|

Here, too, IGS agrees that the sixth paragraph of § 112 controls.  The parties agree in language on the function and that the structure is a transceiver for this section 112, paragraph 6 term.  The only dispute is that IGS places an open-ended construction for the structure of transceiver.  IGS states that "one of skill in the art would understand that any combination RF transmitter and receiver would meet this claim element."  (*See* IGS Opening Br. at 32.) However, means-plus-function terms are inherently limited to the disclosure in the specification. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)  (expressing the principle that means-plus-function limitations are statutorily limited to the "corresponding structure, material, or acts described in the specification and equivalents thereof").  As this term is only cited in the '993 patent, Cadec has identified the structure for transceiver identified in that patent.  Accordingly, Cadec requests the Court to adopt Cadec's structure.

### 3. "a vehicle data communications protocol converter connected to said plurality of electrical conductors"

Cadec agrees that this term should be construed in accordance with Section II(j)(1), above and does not require further construction.

## III. CONCLUSION

For the foregoing reasons, the Court should adopt Cadec's constructions of the disputed terms.

Dated:  April 23, 2010                    Respectfully submitted,


                                   By:   */s/ Paul Morico*_____
                                         Paul Morico
                                         Texas Bar No. 00792053
                                         paul.morico@bakerbotts.com
                                         Lead Attorney
                                         Lisa Kelly
                                         Texas Bar No. 24041659
                                         lisa.kelly@bakerbotts.com
                                         BAKER BOTTS LLP
                                         One Shell Plaza
                                         910 Louisiana Street
                                         Houston, TX 77002
                                         Phone: 713-229-1732
                                         Facsimile: 713-229-7732

                                         Robert R. Lucic (admitted pro hac vice)
                                         NH Bar No. 9062
                                         rlucic@sheehan.com
                                         Edward A. Haffer (admitted pro hac vice)
                                         NH Bar No. 1052
                                         ehaffer@sheehan.com
                                         Peter A. Nieves (admitted pro hac vice)
                                         NH Bar No. 15805
                                         pnieves@sheehan.com
                                         SHEEHAN PHINNEY BASS & GREEN
                                         1000 Elm Street, 17th Floor
                                         Manchester, NH 03101
                                         Phone:  603-627-8188
                                         Facsimile: 603-641-2381

                                         **ATTORNEYS FOR DEFENDANT
                                         CADEC GLOBAL, INC.**

## CERTIFICATE OF SERVICE

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/EMF system per Local Rule CV-5(a)(3) on the April 23, 2010.

*/s/  Paul Morico*
Paul Morico